UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

ADMIRAL BEVERAGE CORPORATION, on
behalf of itself and all others similarly situated,

Plaintiff,

- against –

GOLDMAN SACHS GROUP, INC., GS
POWER HOLDINGS LLC, METRO
INTERNATIONAL TRADE SERVI CES LLC,
JP MORGAN CHASE & CO., HENRY BATH,
LLC, HENRY BATH & SON LTD.,
GLENCORE XSTRATA, PLC, PACORINI
METALS USA LLC, THE LONDON METAL
EXCHANGE LIMITED, LME HOLDINGS
LIMITED, JOHN DOES 1-50,

Defendants.

**CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Admiral Beverage Corporation ("Plaintiff" or "Admiral")

complains, upon knowledge as to itself and its own acts, and upon information and

belief as to all other matters, against Defendants (defined herein at ¶¶ 18-29), as

follows:

## INTRODUCTION

1.     This action arises from Defendants' unlawful combination, agreement

and conspiracy to limit and restrain the availability of aluminum and artificially

inflate the price of aluminum, including the Midwest Transaction Premium, during

the period of at least January 1, 2009 through the present (the "Class Period"), in violation of the Sherman Act, 15 U.S.C. §§ 1 and 2, and common law.

2.      Aluminum is the second most widely used metal in the world. Aluminum is essential in packaging materials (*e.g.*, beverage cans), transportation (*e.g.*, cars) and building and construction materials (*e.g.*, door frames and exterior siding).  Beverage bottlers and distributors, such as Plaintiff, are the second largest industrial users of aluminum with approximately 100 billion aluminum beverage cans produced in North America each year.   All U.S.-made beverage cans are aluminum, representing 20 percent of all of the aluminum produced in the world.

3.      In the United States, aluminum is generally sold using standardized price components such as the LME Official Price and the Platts Midwest Transaction Premium.  Originally, the Midwest Transaction Premium reflected the cost of shipment of aluminum from Baltimore to the Midwest.  Today, the Midwest Transaction Premium represents, among other things, the cost of delivering aluminum from a London Metal Exchange ("LME") warehouse in Detroit or New Orleans (among other locations) to the Midwest and includes the artificial storage costs Defendants imposed on the aluminum market.  The Midwest Transaction Premium is a large component of the purchase price of aluminum paid by bottlers and distributors, such as Plaintiff.

4.     Defendants' self-imposed drastic increases on the storage time, including withholding and delaying shipment, of aluminum stored in the LME-approved warehouses they owned and operated to extract millions (if not billions) of dollars in illegitimate profits from the daily rents Defendants charge to store aluminum in their warehouses.  *The New York Times* revealed that Defendant Goldman Sachs alone collects $250 million a year, or over $680,000 a day, in rent for storing aluminum at their warehouses in Detroit, Michigan as it takes up to sixteen months to retrieve aluminum from Goldman's Detroit warehouses.

5.     Defendants conspired to artificially restrict the availability of the supply of physical aluminum held in their LME-approved warehouses by: (i) agreeing to artificially limit the amount of physical aluminum transported out of their warehouses; (ii) creating a "merry-go-round" of metal by shuffling the aluminum between and among their warehouses rather than making the aluminum available for delivery; (iii) offering financial incentives to owners of LME aluminum receipts to continue storing their aluminum in Defendants' warehouses for longer periods rather than releasing the aluminum into the marketplace; and (iv) abusing the LME's rules, which allow warehouses to release only a small fraction of their inventories each day, to provide an image of legitimacy for Defendants' anticompetitive conduct.

6.      Defendants' restraint of trade artificially inflated the price of aluminum, including the Midwest Transaction Premium, for industrial users of aluminum such as Plaintiff.  Large brewer and bottler MillerCoors estimates that Defendants' warehousing scheme caused a $3 billion aluminum price increase imposed on aluminum purchasers in 2012 alone.

7.      These artificially inflated prices occurred despite aluminum inventories reaching record highs at LME-approved warehouses.  For example, from the end of 2008 to the present, the amount of aluminum held in LME-approved warehouses soared, from just over 1 million tons in July 2008 to a high of approximately 5.5 million tons in July 2013.  LME-approved warehouses were designed to provide a supply of last resort.  They were not designed to hold the vast majority of stored aluminum in the U.S. and the world.

8.      In testifying before the U.S. Senate, Tim Weiner, Global Risk Manager of Commodities and Metals for MillerCoors, described Defendants' warehousing scheme as a "funnel" where more aluminum is loaded into Defendants' LME-approved warehouses, than is loaded-out:

> LME warehouse rules…essentially create a funnel, with a wide end at entry and a very narrow end exiting out.  At the wide end, there is a massive supply of metal going into these warehouses, at the rate of tens of thousands of metric tons per day.  At the narrow end, the LME warehouses, such as those in Detroit, use minimum load-out rates as maximums, releasing no more than 3,000 [metric tons per day].  Just imagine a big garage door market "in" and the small front door of

your house marked "out."  A lot more metal goes into the warehouse than comes out.

9.     Expressing similar sentiments, major industrial users of aluminum, including Coca-Cola Co., complained to the LME, who oversees Defendants' aluminum warehouse network, that Defendants' self-imposed warehouse bottleneck artificially inflated aluminum prices, including the Midwest Transaction Premium.  For example, Dave Smith, Coca-Cola's strategic procurement manager, commented to the *Wall Street Journal* that "[t]he situation has been organized to drive premiums up" as it "takes two weeks to put aluminum in, and six months to get it out."

10.     Defendants' unlawful conduct has also drawn scrutiny from global regulators.  In November 2012, the European Union's Enterprise and Industry Directorate General launched a review of LME warehouse arrangements, following complaints from the aluminum industry of artificially inflated aluminum prices.

11.     In August 2013, the U.S. Commodity Futures Trading Commission ("CFTC") subpoenaed Goldman Sachs, J.P. Morgan Chase & Co. and Glencore Xstrata, and the U.S. Department of Justice ("DOJ") also launched a preliminary investigation into the aluminum warehouse industry following complaints that warehouses owned by certain of the Defendants have led to supply shortages and billions of dollars in increased costs.  The U.K. Financial Conduct Authority

("FCA") is also considering an investigation.   European Union antitrust regulators
are also monitoring Defendants' aluminum warehousing.

12.     The foregoing investigations are expected to yield information from
Defendants' internal records (*e.g.*, instant messages, e-mails, telephone records,
aluminum trading data, etc.) that provide further support for Plaintiff's claims.
Plaintiff believes further evidentiary support for the allegations will be unearthed
after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

13.     This action arises under Sections 1 and 2 of the Sherman Antitrust
Act, 15 U.S.C. §§ 1 and 2, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15
and 26, and common law, respectively.

14.     This Court has jurisdiction over this action pursuant to Sections 1 and
2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, Sections 4 and 16 of the
Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337,
respectively.  This Court also has jurisdiction over the state law claims under 28
U.S.C. § 1367 because those claims are so related to the federal claim that they
form part of the same case or controversy, and under 28 U.S.C. § 1332 because the
amount in controversy for the Class exceeds $5,000,000 and there are members of
the Class who are citizens of a different state than Defendants.

15.     Venue is proper in the Eastern District of Michigan, pursuant to, among other statutes, Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c) and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in the District, and a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of Michigan.

16.     **Interstate Commerce**.  Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate and/or international commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

17.     Plaintiff Admiral Beverage Corporation ("Admiral") is headquartered in Worland, Wyoming.  Admiral manufactures, bottles and distributes PepsiCo, Dr. Pepper Snapple Group and MillerCoors brands in Wyoming, Utah, Montana, South Dakota, Idaho, Colorado, New Mexico, Alaska and parts of Texas.  During the Class Period, Admiral purchased tens of millions of dollars' worth of aluminum pursuant to supply contracts with its aluminum supplier, Crown Holdings, Inc. and Crown Cork & Seal Company (collectively, "Crown Cork"), whose price was based on the LME aluminum price and the Midwest Transaction Premium.

a.     Admiral, by way of assignment from Crown Cork, brings this action as a direct purchaser of aluminum and the Midwest Transaction Premium imposed on Crown Cork at the time Crown Cork purchased aluminum from Novelis, Inc. ("Novelis"), one of the world's leading aluminum producers.  In its Form 10-K for the year-ending March 31, 2013, Novelis reports "Net Sales" of approximately $10 billion and that 51% of those sales were made to Novelis' ten largest customers.  Novelis also reports that its single-largest end-use market is beverage can sheet, which is sold directly to beverage makers and bottlers, and lists Crown Cork as one of its "major customers" for beverage and food cans (other "major customers" listed by Novelis include Anheuser-Busch, Inc. and various bottlers of the Coca-Cola System).   Crown Cork is one of the world's leading suppliers of beverage cans and ends and other aluminum packaging products, which Crown Cork sells to a variety of beverage and beer companies, including Admiral, Anheuser-Busch InBev, Carlsberg, Coca-Cola, Cott Beverages, Dr Pepper Snapple Group, Heineken, National Beverage and Pepsi-Cola, among others.  Crown Cork's "Americas Beverage" segment, which manufactures aluminum beverage cans and ends and steel crowns, reported net sales in 2012 of $2.3 billion.

18.     Defendant Goldman Sachs Group, Inc. ("Goldman Sachs") is a leading global investment banking, securities and investment management firm that provides a wide range of financial services to a substantial and diversified

client base.  Goldman Sachs is located at 200 West Street, New York, New York 10282.  Through December 2012, Goldman Sachs was the largest LME principal.

19.     Defendant GS Power Holdings LLC ("GS Power Holdings") is a subsidiary of Goldman Sachs.  GS Power Holdings is located in this District at 85 Broad Street, New York, New York 10004.

20.     Defendant Metro International Trade Services LLC ("Metro International") is a global warehouse operator, specializing in the storage of non-ferrous metals, including aluminum, for the LME.  Metro International is an LME-approved warehouse.  Metro International was acquired by Goldman in February 2010 and operates as a subsidiary of GS Power Holdings LLC.  As of March 8, 2013, Metro International operated 29 out of a total of 37 LME-listed storage facilities in Detroit, Michigan.  This site houses approximately one-quarter of the total aluminum supply stored in LME-approved warehouses globally and over 70% of the available aluminum in North America.  The headquarters of Metro International is located at 6850 Middlebelt Road, Romulus, Michigan 48174.

21.     Goldman Sachs, GS Power Holdings, and Metro International are sometimes hereinafter referred to as the "Goldman Defendants."

22.     Defendant JP Morgan Chase & Co. ("JP Morgan") is a Delaware financial holding company headquartered in New York, New York.  JP Morgan is

headquartered in this District at 270 Park Avenue, New York, NY 10017.  JP

Morgan has been the owner of Defendant Henry Bath since July 2010.

23.     Defendant Henry Bath, LLC is a United States Company, world

leading logistics provider specializing in the storage and shipping of exchange

traded metals, and is a founding member of the London Metal Exchange.  Henry

Bath, LLC is headquartered at 2500-A Broening Highway in Baltimore, MD 21224

and is a subsidiary of Defendant Henry Bath & Son, Ltd.  It owns and operates

numerous LME-approved warehouses in the United States, including warehouses

in Baltimore, Maryland; Chicago, Illinois; and New Orleans, Louisiana that store

aluminum.

24.     Defendant Henry Bath & Son, Ltd. is a London Based company, and

is the parent company presiding over the Baltimore, Singapore, and Rotterdam

offices, headquartered in 12 Princes Parade, St. Nicholas Place, Liverpool L3 1BG,

United Kingdom.

25.     Defendant Glencore Xstrata, PLC ("Glencore") is a multinational

commodity trading and mining company headquartered in Baar, Switzerland.  The

company was created through a merger of Glencore and Xstrata on May 2, 2013.

Glencore has been the owner of Pacorini USA and Pacorini BV (collectively,

"Pacorini") since September 2010.

26.     Defendant Pacorini Metals USA LLC is a limited liability company organized under the laws of Delaware and headquartered at 220 Broening Highway, Baltimore, Maryland 21224.  It owns and operates LME-approved warehouses in the United States, including warehouses in Los Angeles, CA; Baltimore, Maryland; Chicago, Illinois; Detroit, Michigan; Mobile, Alabama; and New Orleans, Louisiana that store aluminum.

27.     Defendant the London Metal Exchange Limited ("LME") is located at 56 Leadenhall Street, London EC3A 2DX, United Kingdom.   On December 6, 2012, the stock of the LME's parent company, Defendant LME Holdings Ltd., was acquired by Hong Kong Exchanges & Clearing Limited which owns the HKEx Group, an integrated exchange group in Hong Kong ("HKEx").  Prior to its acquisition by Hong Kong Exchanges & Clearing Limited, Defendant LME Holdings Limited was owned by Defendant Goldman and other leading American banks including JPMorgan, Citigroup, Merrill Lynch and Morgan Stanley. Reportedly, JPMorgan and Goldman Sachs earned approximately $400 million in the sale of the stock of LME Holdings Ltd. to Hong Kong Exchanges & Clearing Limited.

a.     The LME is the world's largest non-ferrous metals market and a private trade association for Defendants here.  More than 80% of all global non-ferrous metal futures business is transacted through its trading platforms.  The non-

ferrous metals exchanged through the LME are aluminum, aluminum alloy, copper, tin, nickel, zinc, lead, NASAAC, cobalt and molybdenum.  The LME handles total trading volumes of about $61 billion per day.  The vast majority of aluminum trading activity on the LME takes place among banks, hedge funds and traders, rather than users of aluminum.

b. Until is acquisition by the HKEx Group in December 2012, the LME was owned, controlled and governed by its members.  J.P. Morgan Securities PLC (a subsidiary of JPMorgan) is a "Category 1" member of the LME, Goldman Sachs International (a subsidiary of Goldman Sachs) is a "Category 2" member of the LME, and Glencore (UK) Ltd. (a subsidiary of Glencore) is a "Category 5" member of the LME.

c. Prior to the acquisition, the members/shareholders of the LME were much more involved in the management of the LME than is typical of shareholders in a corporation.  Much of the work of the LME is conducted through committees of members and/or their affiliates.  For example, the LME's Warehousing Committee includes executives from Metro, Henry Bath and Pacorini (or their affiliates).  And, again, JPMorgan and Glencore affiliates sit on the LME's Aluminum Committee.

d. As of the acquisition by the HKEx Group, Goldman Sachs was the largest shareholder in the LME.

e.     The LME certifies and purports to supervise a global network of more than 700 warehouses for the storage of metals, including the Metro, Henry Bath and Pacorini USA warehouses in the United States.

f.     Through its various activities, the LME is the agent of its aluminum producer members and affiliates for warehouse rules for storage and load-out and other functions related to the activities alleged herein which affect prices, including the Midwest Transaction Premium and supply of aluminum for physical delivery.

28.     John Doe Defendants Nos. 1-50 are other entities or persons, who own warehouses, have similar financial interests as the Defendants, or have otherwise participated as co-conspirators with Defendants in the agreement.  The John Doe Defendants participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of the price of physical aluminum and the Midwest Transaction Premium to artificial levels.

29.     The Goldman Defendants and Defendants JP Morgan, Henry Bath, LLC, Henry Bath & Son, Ltd., Glencore, Pacorini Metals USA LLC, the LME, LME Holdings Ltd. and John Doe Defendants Nos. 1-50 are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. The Production of "Primary" and "Secondary"  Aluminum

30.     Aluminum is the second most widely used metal in the world.  The largest product markets for aluminum are transportation (*e.g.*, cars), packaging materials (*e.g.*, beverage cans) and building and construction materials (*e.g.*, door frames and exterior siding).  Beverage bottlers and distributors, such as Plaintiff, are the second largest industrial users of aluminum with approximately 100 billion aluminum beverage cans produced in North America each year.   All U.S.-made beverage cans are aluminum, representing 20 percent of all of the aluminum produced in the world.

31.     Aluminum is produced from two source materials: (i) bauxite (used in the production of "primary aluminum"); or (ii) recycled scrap (used in the production of "secondary aluminum").  There is no material difference between primary and secondary aluminum as both have the same physical properties.

32.     **Primary Aluminum**.  Primary aluminum is produced from the ore bauxite.  Bauxite ore mining is a global industry and predominantly occurs in Australia, Brazil, Ghana, Guinea, India, Jamaica and areas of Russia and China.

33.     Bauxite ore provides the raw material from which alumina is extracted.  The extraction process, called alumina refining, provides material which is then used to produce primary aluminum metal.  Primary aluminum is produced through a process called smelting, using alumina as a raw material.

34.     After alumina is extracted from the bauxite ore and refined into primary aluminum, producers of aluminum then shape the primary aluminum into ingots, sheets or rolls, among other shapes or forms.

35.     **Secondary Aluminum**.  Aluminum scrap is the raw material used to produce secondary aluminum.  Aluminum scrap is derived from either "new" or "old" scrap.  New scrap is created as aluminum is processed by fabricators into industrial products.  Old scrap is retrieved from discarded products, such as old automobile parts, beverage cans or aluminum siding, among other products.

36.     Secondary aluminum is produced by melting aluminum scrap in a furnace to liquefy the metal.  It is then purified and produced into a form for processing or fabrication.

## B. The Supply of Aluminum Outpaced Demand During the Class Period

37.     In 2012, approximately 46 million tons of aluminum was produced globally.  Aluminum consumption in the United States totaled 4.5 million tons, with 26% or 1.2 million tons used in the packaging industry, such as in producing aluminum beverage cans.  All U.S.-made beverage cans are aluminum.  Approximately 100 billion aluminum beverage cans are produced in North America each year.

38.    From 2008 through 2012, the relationship between supply and demand for aluminum was relatively stable.  During the Class Period, the supply of aluminum outpaced demand.

**Global Aluminum Supply-Demand Statistics for Years 2008 Through 2013 (million tons)**

|  | **2008** | **2009** | **2010** | **2011** | **2012** | **2013 (YTD)** |
|---|---|---|---|---|---|---|
| Supply | 39.8 | 37.29 | 41.61 | 44.72 | 46.18 | 23.5 |
| Demand | 36.91 | 34.57 | 40.17 | 42.41 | 45.22 | 22.61 |
| Balance | 2.89 | 2.72 | 1.44 | 2.31 | 0.96 | 0.89 |



Source:  World Bureau of Metal Statistics (Bloomberg).

## C. **The Price of Physical Aluminum**

39.     In the United States, aluminum in the form of ingots, sheets or rolls are stored in warehouses and generally sold using standardized price components including the LME Official Price and the Midwest Transaction Premium.

40.     **The LME Official Price**.  The LME Official Price is the global benchmark for physical aluminum contracts.  The LME Official Price is the last bid and offer price quoted during the second LME "Ring" trading session.  The LME Official Price is quoted for cash (*i.e.*, spot purchase), three month and three forward December prompts (*i.e.*, settlement or maturity dates).

41.     The Ring is one of the platforms on which LME contracts are traded. The Ring is an open-outcry trading floor, *e.g.*, a public auction for making bids and offers on the floor of the LME.  Each LME metals contract, including aluminum, trade in the Ring beginning at 11:40 GMT.  There are two separate, five-minute Ring trading sessions each business day for each individual LME metals contract. For example, the first Ring session for aluminum is 11:55 to 12:00 London time and the second ring session is from 15:15 to 15:20 (3:15 to 3:20 p.m.) London time.

42.     The LME only permits a small number of entities to participate in Ring trading.  All LME floor trading must be done through a Ring dealing member considering both buying and selling sides to a trade.  There are currently 11 Ring Dealers.  The 11 current Ring Dealers or Category 1 members are (i) Amalgamated

Metal Trading Limited; (ii) ED&F Man Capital Markets Limited; (iii) INTL

FCStone Ltd; (iv) J.P. Morgan Securities plc; (v) Jeffries Bache Limited; (vi)

MAREX Financial Limited; (vii) Metdist Trading Limited; (viii) Newedge UK

Financial Limited; (ix) Société Générale; (x) Sucden Financial Limited; and (xi)

Triland Metals Limited.

43.     During each five-minute period, the Ring Dealers declare their buying

or selling prices and the prompt date in which the Ring Dealers want to trade.

44.     The second five-minute Ring trading session is the focal point of the

trading day because the LME Official Price for each contract is determined.  The

LME Official Price is the global benchmark for physical aluminum contracts.

45.     **The Midwest Transaction Premium**.  The Midwest Transaction

Premium is the domestic aluminum price premium.  The Midwest Transaction

Premium is a large component of the purchase price of aluminum paid by bottlers

and distributors.  During the Class Period, the Midwest Transaction Premium

represented the cost of delivering aluminum from a LME warehouse in Detroit or

New Orleans, among other locations, to the Midwest.  The Midwest Transaction

Premium reflects, among other things, (i) the cost of financing; (ii) the cost of

storage (*i.e.*, warehousing); and (iii) the cost of freight for delivering aluminum to

the Midwest, United States.  The cost of storage is a key element of the Midwest

Transaction Premium.

### D. **The Role of LME-Approved Warehouses in the Physical Aluminum Market**

46.     The LME is the world hub for trading in industrial metals with more than 80% of the global non-ferrous metals (*i.e.*, other than iron) business transacted on the LME.  According to the LME, "the prices discovered on [its] three trading platforms [Ring, Telephone and Electronic] are used as the global benchmark [for aluminum and other LME metals]."  The LME provides a price discovery tool for physical aluminum.  This price does not, however, include the costs of freight and handling from a seller to a buyer.

47.     The LME oversees a global network of more than 700 metals warehouses, with approximately 160 of the LME's metals warehouses located in the United States.  Defendants Metro, Henry Bath, and Pacorini collectively own and operate approximately 80% of the LME-approved warehouses in the United States.  LME-approved warehouses were designed to provide a supply of last resort.  They were not designed to hold the vast majority of stored aluminum in the U.S. and the world.

48.     The LME establishes rules for the warehousing of exchange-traded aluminum.  The rules for LME-approved warehouses, such as those owned and operated by Defendants, are influenced by the LME Warehousing Committee.  Defendants Metro, Henry Bath and Pacorini each have representatives on the Warehousing Committee.  The LME rules establish the minimum amount of metal

19

(*e.g.*, aluminum) required to be withdrawn by LME-approved warehouses each day as well as the daily storage fees LME-approved warehouses are able to charge those who store metals there. The LME receives a direct financial benefit, approximately 1% of the warehousing fees, charged by LME-approved warehouses.

49.   LME-approved warehouses are critical to aluminum trading. Delivery of the commodity underlying LME contracts (*e.g.*, aluminum forward or futures contracts) occurs through warrants. At the expiration of an LME aluminum forward or futures contract, delivery of warrants for aluminum in an LME-approved warehouse must be made by sellers (or "shorts") who have not liquidated (*i.e.*, traded out of their contract) to buyers (or "longs") who have not liquidated. It gives the holder of the warrant the right to take possession of the specific metal (*e.g.*, aluminum) in a specific LME-approved warehouse. Each warrant represents one lot of material. All such material must be of a brand listed as good delivery by the directors of the LME. LMEsword is the electronic transfer system for LME warrants.

50.   LME-approved warehouses are the only warehouses that LME delivery warrants can be issued and cancelled. To issue a warrant means that aluminum has been checked into such a warehouse for storage, and to cancel a warrant means that the aluminum has been earmarked for delivery from the

warehouse.  Thus, without a link to timely-deliverable metal, price discovery is lost.

51.     Each day by 4:30 pm GMT, LME-approved warehouses submit to the LME a stock report for each of the LME's metals (*e.g.*, aluminum) stored in their respective warehouse.  The LME collects the information submitted by the warehouses and publishes the stock report the following morning at 9:00 am GMT. Among other things, the LME daily stock report displays the amount of metal in the LME-approved warehouses as well as the amount of metal that has been moved into and out of the LME-approved warehouses the previous day.

### E. Aluminum Inventories in Defendants' LME-Approved Warehouses Reach Record Highs

52.     From the end of 2008 to the present, the amount of aluminum held in LME-approved warehouses soared, from just over 1 million tons in July 2008 to a high of approximately 5.5 million tons in July 2013.



53.     In addition, aluminum held in U.S.-based LME-approved warehouses jumped from 2005 to 2013, reaching a high on February 29, 2012 with 2.2 million tons of aluminum stored in the U.S. alone.



54.     As aluminum inventories in LME-approved warehouses rose, the

Midwest Transaction Premium also increased dramatically.



**F.  The LME's *De Facto* Maximum Load Out Rule is an Agreement to Restrain Trade**

55.  **The LME's Warehouse Rules**.  Prior to April 2012, LME rules required LME-approved warehouses to deliver or load out a minimum tonnage of aluminum on a daily basis.  Prior to April 2012, the LME required 1,500 tons of aluminum to be loaded out per city, per day.  This rule applied to all of the

warehouses in a city owned by the same company (*e.g.*, all of Goldman/Metro's warehouses in Detroit, Michigan), rather than per warehouse. Thus, all of Goldman's warehouses in Detroit collectively only needed to load out 1,500 tons per day. For example, as of March 2013, Goldman operated 37 warehouses in the Detroit area. Under the LME's rules Goldman, need only load out an average of 40.5 tons per warehouse whereas if another company only operated one warehouse in Detroit, that one warehouse would need to load out the full 1,500 tons each day.

56.     As alleged herein, Defendants' treated this minimum load out rule as a maximum load out rule in order to earn illegitimate profits, from among other things, increased storage revenue from increased and excessive queues. This *de facto* maximum had the blessing of the LME because the LME receives 1% of the rental revenues collected from LME-approved warehouses each year. Thus, the LME load out minimums, including the increased load out rule in April 2012 to 3,000 tons per day, operated as an agreement to restrain trade, caused an anticompetitive effect in the aluminum market and unreasonably restrained trade in the market for aluminum.

57.     In fact, this 1,500 ton minimum, however, was substantially less than what Defendants' could in fact load out each day, had Defendants' been operating competitively and efficiently. For example, *Reuter*s calculated that an experienced forklift driver takes approximately 20 minutes to load one 20-ton truck with

aluminum.  Under *Reuters* calculation, one warehouse alone with two doors, two forklifts, and an eight-hour working day could move out 1,920 tons of aluminum each day.  Significantly, *Reuters* calculation applied to *one warehouse* that should load out 420 tons more of aluminum each day than LME rules required for all warehouses in one city.

58.   **The Entry of Wall Street In LME-Approved Aluminum Warehousing in 2010 Further Restricts the Supply of Aluminum**.  In February 2010, Defendant Goldman Sachs acquired Defendant Metro for $550 million.  In July 2010, Defendant JPMorgan acquired Defendant Henry Bath and in September 2010, Defendant Glencore acquired Defendant Pacorini.  These acquisitions concentrated all of the key elements of LME price discovery—ownership, warehousing, control of LME policy and trading—in the hands of a few financial institutions.

59.   Testifying before the Senate Committee on Banking, Housing, and Urban Affairs, Subcommittee on Financial Institutions and Consumer Protection on July 23, 2013, Professor Saule Omarova stated "[o]wnership of the key LME warehouses by large commodity traders with integrated financial and physical metals operations allows them to control the supply of aluminum to commercial users and, as a result, to control prices."

60.     The acquisitions also provided Goldman Sachs, JPMorgan and Glencore further influence on the LME's Warehousing Committee, through Metro, Henry Bath and Pacorini's existing seats.  As alleged above, the LME Warehousing Committee makes recommendations to the LME regarding warehousing rules, including, minimum delivery requirements and storage fees.

61.     In addition, the acquisitions presented Goldman Sachs, JPMorgan and Glencore with an "edge" in their commodities trading business.  As revealed by the *New York Times*, "[b]y controlling warehouses, pipelines and ports, banks gain valuable market intelligence, investment analysts say. That, in turn, can give them an edge when trading commodities."

62.     Likewise, Professor Omarova continued in his Senate Testimony,

> [M]etal warehousing operations are only one element in a large financial conglomerate's complex business strategy involving trading in metals and related financial contracts. Goldman is one of the largest traders of derivatives in the metals markets. Unlike an independent warehouse operator, Goldman can potentially use its storage capabilities not only to generate rental income but also to move commodity prices in a way that would benefit its derivatives positions. This directly implicates serious issues of market integrity. As one of the world's biggest dealers in commodity derivatives, Goldman can devise and execute highly sophisticated trading strategies across multiple markets. The ability to influence prices of physical assets underlying derivatives, in effect, completes the circle. It makes Goldman's derivatives profits not so much a function of its traders' superior skills or executives' talents, but primarily a function of the firm's structural market power.

63.     These acquisitions have increased the excessive wait times at

Defendants' LME-approved warehouses.  Defendants' anticompetitive and

monopolistic conduct increased average wait times to sixteen months.  These

delays have derived illegitimate profits for Defendants, because Defendants' earn

more storage rent the longer the aluminum stays in their warehouses.

64.     Testifying before the U.S. Senate, Tim Weiner, Global Risk Manager

of Commodities and Metals for MillerCoors, stated,

> [T]he aluminum [MillerCoors is] purchasing is being held up in
> warehouses controlled and owned by U.S. bank holding companies,
> who are members of the LME, and set the rules for their own
> warehouses.  These bank holding companies are slowing the load-out
> of physical aluminum from these warehouses to ensure that they
> receive increased rent for an extended period [of] time.  Aluminum
> users like MillerCoors are being forced to wait in some cases over 18
> months to take physical delivery due to the LME warehouse practices
> or pay the high physical premium to get aluminum today.

65.     In describing Defendants' warehousing scheme, Mr. Weiner

continued,

> LME warehouse rules…essentially create a funnel, with a wide end at
> entry and a very narrow end exiting out.  At the wide end, there is a
> massive supply of metal going into these warehouses, at the rate of
> tens of thousands of metric tons per day.  At the narrow end, the LME
> warehouses, such as those in Detroit, use minimum load-out rates as
> maximums, releasing no more than 3,000 [metric tons per day].  Just
> imagine a big garage door market "in" and the small front door of
> your house marked "out."  A lot more metal goes into the warehouse
> than comes out.

66.    For example, from January through June 2011, Goldman's Metro warehouses in Detroit took in 364,175 tons of aluminum and delivered out less than half, a mere 171,350 tons.  This represented 42% of all aluminum inventory arrivals globally and 26% of all aluminum delivered out.

67.    **Defendants' "Merry-Go-Round" of Metal**. As alleged above, the LME's *de facto* maximum load out rules allowed Defendants' to keep aluminum in their warehouses. Defendants, however, further evaded the load out rules by shifting inventories of aluminum from one LME-approved warehouse to another so as to appear to comply with the LME's load-out rules thereby restricting access to aluminum from industrial users.  The result, as revealed by a recent *New York Times* exposé, using Goldman's Metro warehouses as an example, is that "nearly all of the metal that Metro moves is not delivered to customers .... Instead, it is shuttled from one warehouse to another."   The *New York Times* described the shuffle as:

> Each day, a fleet of trucks shuffles 1,500-pound bars of [aluminum] among the warehouses. Two or three times a day, sometimes more, the drivers make the same circuits. They load in one warehouse. They unload in another. And then they do it again.

68.    Former Metro forklift driver, Tyler Clay, described the scheme as a "merry-go-round of metal."

69.    The "merry-go-round" was so commonplace at Goldman's Metro facilities as the same truck drivers would make three or four round trips each day.

This allowed Metro employees to routinely pass messages back and forth between the various Metro warehouses as noted by another former Metro forklift team leader, Anthony Stuart.

70.    The purpose of the "merry-go round" was simple: greed. Sources from *The New York Times*' exposé reveal that "the longer waiting times are part of the company's strategy and help Goldman increase its profits from the warehouses."

71.    **<u>Warrant Cancellations Skyrocket</u>**.  *The New York Times* also revealed that a large amount of the aluminum inventory held in Defendant Metro's Detroit warehouses is not owned by industrial users of aluminum such as Plaintiff, but banks and hedge funds.  Defendants and their unnamed co-conspirators first purchase inventories of aluminum.  Defendants and their unnamed co-conspirators then place their aluminum inventories under warrant at LME warehouses.  This is followed by a "merry-go-round" transfer of the aluminum among Defendants' warehouses.  The banks then cancel the LME aluminum warrant based on the "merry-go-round" transfer and then reinstate the warrant once the aluminum has reached the next warehouse.  Thus, the aluminum never reaches the marketplace, but continues to be shuffled among Defendants' LME-approved warehouses.



72.    This created an artificial shortage of aluminum in the marketplace and resulted in artificially higher aluminum prices and artificially higher Midwest Transaction Premiums.

73.    **Defendants' Offer Anticompetitive Financial Incentives to Maintain Their Aluminum Stockpiles**.  In addition to the "merry-go-round," Defendants' scheme was furthered by the anticompetitive financial incentives Defendants' offered those who already store aluminum in their warehouses to

maintain their aluminum in the warehouses, rather than release it into the market. For example, Glencore (through Pacorini) has offered financial incentives at its warehouses in Vlissingen. *Reuters* reported, quoting a London-based trader, "[f]resh material is being bid slightly because Pacorini are paying big incentives to get metal there, in Vlissingen. Then they deliver it to the market and whoever holds it can't actually get it out for a year." *The New York Times* also revealed that Defendant Metro offers owners financial incentives of up to $230 a ton, and then Metro moves their metal from one warehouse to another.

74.     Defendants' anticompetitive conduct created additional financial incentives to leave aluminum in their warehouses. For example, when a commodities market is in contango (*i.e.*, a market condition wherein the deferred futures price is *above* the present cash or spot price), a holder of the commodity has an opportunity for profit if storage and other related costs for holding the commodity are less than the difference between the spot price and the futures price. This is in contrast with a market condition known as backwardation (*i.e.*, the deferred futures price is trading *below* the present cash or spot price). For example, in May 2012, LME cash aluminum traded at a $40 per ton discount or contango to the LME three-month aluminum forward contract. A physical aluminum dealer commented to *Reuters*, "[t]he banks have no incentive to sell because they are making so much. The contango is around $40 cash to three's

[LME three-month aluminum forward contract]…they can make money all day long.  Why sell [aluminum]?"  This allowed financial institutions to make a profit by buying aluminum now, store it and pay Defendants' storage revenue and then contract to sell the aluminum in the future.  Transactions such as this created an aluminum bottleneck and artificially inflated the price of aluminum and the Midwest Transaction Premium.

75.     Defendants' use of financial incentives offered to owners of aluminum already stored in Defendants' LME-approved warehouses to maintain, rather than release, their aluminum stocks created a contango market through lower carrying costs and manipulates the prices of aluminum and the Midwest Transaction Premium to artificial levels.

### G. <u>The Midwest Transaction Premium Reaches Unprecedented Levels</u>

76.     The Midwest Transaction Premium is a large component of the purchase price of aluminum paid by bottlers and distributors, such as Plaintiff. Excess queues and lengthy delays in retrieving aluminum from Defendants' LME-approved warehouses caused an unprecedented increase in the Midwest Transaction Premium.  The Midwest Transaction Premium represents, among other things, the cost of financing, warehousing (*i.e.*, storage) and shipment to the Midwest, United States.  Defendants' scheme to delay delivery of aluminum created an artificially higher Midwest Transaction Premium as the longer

aluminum is stored in Defendants' LME-approved warehouses, the higher the cost of storage.  The cost of storage is a key component of the Midwest Transaction Premium.

77.     As can be observed, in January 2008, the Midwest Transaction Premium was less than 4 cents per pound and continued to increase and spike during the Class Period reaching unprecedented highs of 12 cents per pound.



Midwest Transaction
Premium (cents per
lb.)
2005-2013

### H. Some of the World's Largest Industrial Users of Aluminum Complain Publicly About Defendants' Unlawful Conduct

78.     Major industrial users of aluminum including Coca-Cola Co. complained to the LME that Defendants' self-imposed warehouse bottleneck artificially inflated aluminum prices.  For example, Dave Smith, Coca-Cola's strategic procurement manager, commented to the *Wall Street Journal* that "[t]he

situation has been organized to drive premiums up" as it "takes two weeks to put aluminum in, and six months to get it out."

79.     Further, in recent Senate testimony, MillerCoors LLC estimated that Defendants' warehousing scheme caused a $3 billion aluminum price increase for companies that purchase aluminum in 2012 alone.

80.     Other trade groups, such as the Beer Institute, which represents the world's largest beer brewers, filed a complaint with the LME stating that the LME has not done enough to ease aluminum supply bottlenecks in LME-approved warehousing.   Spokesman for the Beer Institute, Christopher Thorne, commented that the delays in receiving aluminum from LME-approved warehousing "are basically preventing brewers and suppliers from obtaining aluminum in a reasonable time frame or at fair market prices."

81.     **Following Public Complaints, European Economics Reviews the LME's Warehousing Minimum Load Out Rules**.  In response to complaints about excessive waits at LME-approved warehouses, the LME was forced into a façade of action.  The LME commissioned a study by consulting firm European Economics.

82.     European Economics developed a full report, entitled "Assessment of Warehouse Minimum Loading Out Rates."  The focus of the study was the LME aluminum market.  European Economics did not review, however, "[b]roader

issues surrounding allegations of manipulation and the entrance of large financial players are beyond the scope of this report."   The executive summary and recommendations of European Economics review, but not the full report, was released on May 27, 2011.

83.    European Economics "prime recommendation…[was] that a level should be set well above the present limit [1,500 tons per city, per warehouse, per company] in the loading-out table at which a large warehouse would be obliged substantially to increase its loading out rate."

84.    European Economics recommended that the loading out requirement be increased to 1,500 tons per 300,000 tons of stock but admitted that even this requirement could result in queues of up to 200 days, which is "still longer than desirable for the LME system."

85.    The LME eventually increased its loading out requirements, effective April 2012.  Under the new LME rules, larger warehouses such as those with over 900,000 tons of metal stored, were required to load out 3,000 tons per day.  This was substantially less than the recommendation of European Economics.  Under European Economics recommendation, a warehouse company with over 900,000 tons stored would be required to load out a minimum of 4,500 tons per day. European Economics also acknowledged that, even under its more aggressive

proposal (1,500 tons per 300,000 tons of stock or 4,500 tons per 900,000 tons of stock), it was possible that unacceptably long queues would still remain.

86.    **Complaints Of Excessive Queues Continue**.  Even after the LME increased its minimum load-out requirements, market participants still complained of excessive wait times to retrieve aluminum.  In response, the LME approved stricter warehouse rules on November 7, 2013.

87.    Under the new LME rules set to take effect in April 2014, the LME will measure the amount of aluminum loaded into a warehouse over a three-month period.  If a warehouse queue of more than 50 calendar days exists, the warehouse would be required to deliver out additional aluminum based upon a formula.

88.    For example, a warehouse currently required to deliver out a daily tonnage of 3,000 tons would need to load out at least 1,500 tons per day more than it loads in.  Also, if the current load-in rate of the warehouse exceeds the minimum load-out rate, then the warehouse would be required to deliver out tonnage equal to that excess.

## I.  Government Investigations

89.    Defendants' unlawful conduct has also drawn scrutiny from global regulators.  In November 2012, the European Union's Enterprise and Industry Directorate General launched a review of LME warehouse arrangements, following complaints from the aluminum industry of artificially inflated aluminum prices.

90.     The CFTC subpoenaed Goldman Sachs, J.P. Morgan Chase & Co. and Glencore Xstrata and the DOJ also launched a preliminary investigation into the aluminum warehouse industry following complaints that warehouses owned by certain of the Defendants have led to supply shortages and billions of dollars in increased costs.  The FCA is also considering an investigation into Defendants' aluminum warehousing practices.  European Union antitrust regulators are also monitoring Defendants' aluminum warehousing.

### J.   JP Morgan Announces Plans to Sell Its Physical Commodities Business and Goldman Sachs Responds to *The New York Times* Investigation

91.     Following the public scrutiny and opening of government investigations, certain Defendants announced changes to their warehousing practices or, in the case of JPMorgan, announced plans to exit the warehousing business.

92.     On or about July 26, 2013, JPMorgan announced plans to exit the physical commodities business, including metals warehouses.

93.     On July 31, 2013, following an article published in *Bloomberg* by a leading economist, titled "Banks' Role in Metal Trade Deserves Scrutiny," Goldman Sachs announced several steps to reduce load-out times at its Metro Detroit warehouses, including (i) increasing the daily load-out rate; (ii) offering

priority to end-users; (iii) offering customers immediate access to their aluminum; and (iv) enhancing disclosure and transparency.

## PLAINTIFF'S INJURY

94.     Defendants' restraint of trade and anticompetitive conduct complained of herein had adverse consequences on competition, prices, efficiency and transportation in aluminum storage services, and the level of available output of aluminum.  Plaintiff and other members of the Class were deprived of normal, competitive aluminum prices.  Industrial users of aluminum, such as Plaintiff, were subjected to artificially inflated prices and artificial price trends as an intended, direct and foreseeable result of Defendants' unlawful, manipulative and anticompetitive conduct.  Plaintiff and the Class suffered financial loss, and were, therefore, injured in their business or property.

## CLASS ACTION ALLEGATIONS

95.     Plaintiff bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and as representative of the following Class:[1]

> All persons or entities who directly purchased aluminum in the United States and first paid the Midwest Transaction Premium from January 1, 2009 through the present.  Excluded from the Class are defendants and their employees, affiliates, parents, subsidiaries and co-conspirators, whether or not named in this Complaint.

---

[1] Plaintiff defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, with limitation, the Class Period.

96.    The Class is so numerous that the individual joinder of all members is impracticable.  While the exact number and identity of Class members is unknown to Plaintiff at this time, it can be ascertained.  Plaintiff is informed and believes that there are at least hundreds of geographically dispersed Class members.

97.    Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

98.    Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff is an adequate representative of the Class and has no interests which are adverse to the interests of absent Class members.  Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

99.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  These common questions of law and facts include, without limitation:

      a. Whether Defendants unlawful acts violate Section 1 of the Sherman Act;

      b. Whether Defendants unlawful acts violate Section 2 of the Sherman Act;

c. Whether Defendants monopolized, attempted to monopolize and/or conspired to monopolize in violation of law;

d. Whether Defendants made agreements in unreasonable restraint of trade;

e. Whether Defendants combined, conspired and agreed to restrain supplies or inflate prices of aluminum, including the Midwest Transaction Premium;

f. Whether such violations artificially fixed or inflated prices of aluminum, including the Midwest Transaction Premium;

g. Whether such inflation and artificiality caused antitrust injury to the property of Plaintiff and Class members;

h. The operative time period and extent of Defendants' foregoing violations;

i. Whether Defendants were unjustly enriched at the expense of Plaintiff and members of the Class;

j. Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted; and

k. Whether injunctive relief enjoining the reoccurrence of Defendants' conduct and/or declaratory relief that such conduct is unlawful, is warranted.

100. A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that

numerous individual actions would engender.  Class treatment will also permit the

adjudication of claims by many class members who could not afford individually

to litigate claims such as those asserted in this Complaint.  The cost to the court

system of adjudication of such individualized litigation would be substantial.  The

prosecution of separate actions by individual members of the Class would create a

risk of inconsistent or varying adjudications, establishing incompatible standards

of conduct for Defendants.

101.   Plaintiff is unaware of any difficulties that are likely to be

encountered in the management of this action that would preclude its maintenance

as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

102.   The statute of limitations relating to the claims for relief alleged

herein were tolled because of Defendants' active acts of concealment.  Defendants'

anticompetitive conduct was also inherently self-concealing.

103.   Defendants fraudulently concealed their anticompetitive conduct.

Because of such fraudulent concealment, Plaintiff and the members of the Class

could not have discovered the existence of same any earlier than public disclosures

thereof.  As a result, Plaintiff and the Class had no knowledge of Defendants'

unlawful and anticompetitive acts and could not have discovered same by the

exercise of due diligence on or before July 20, 2013 when public reports revealed

Defendants' active acts of concealment and inherently self-concealing conduct, including Defendants' "merry-go-round" of metal.

104.   As a result of Defendants' concealment of their unlawful and anticompetitive conduct, Plaintiff asserts the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff.

105.   Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(For Violation of Section 1 of the Sherman Act, 15 U.S.C. §1, *et seq.*)**
**Against All Defendants**

106.   Plaintiff realleges and incorporates the preceding allegations of the Complaint with the same force and effect as if fully restated herein.

107.   Defendants entered into and engaged in a combination and conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

108.   Defendants' combination and conspiracy intentionally, directly and foreseeably inflated prices for aluminum in the United States, including the Midwest Transaction Premium.

109.   The combination and conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants

and their co-conspirators in furtherance of which Defendants fixed, maintained and/or made artificial prices for aluminum, including the Midwest Transaction Premium.

110.   Defendants' combination and conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

111.   Defendants' conspiracy, and resulting impact on the price of aluminum, including the Midwest Transaction Premium, occurred in or affected U.S. interstate commerce.

112.   As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.  Without limiting the generality of the foregoing, Plaintiff and members of the Class paid artificial and non-competitive prices for aluminum as a proximate result of Defendants' anticompetitive conduct.  Plaintiff and the other members of the Class were also deprived of the benefits of free and open competition in purchasing aluminum.

113.   Plaintiff and members of the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants' from engaging in additional anticompetitive conduct.

## SECOND CLAIM FOR RELIEF
### (Violation of Section 2 of the Sherman Act, 15 U.S.C. §2)
### Against All Defendants

114.   Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

115.   In violation of Section 2 of the Sherman Act, Defendants monopolized, attempted to monopolize, and/or conspired to monopolize.

116.   Defendants had market power to raise the price of aluminum, including the Midwest Transaction Premium, in the United States.  During the Class Period, Defendants owned approximately 80% of U.S. LME-approved warehouses.  The LME also controlled approximately 97% of the aluminum futures and forward trading market in the United States and had the power to approve and regulate the warehouses that hold approximately 95% of the aluminum available for such trading.  As a result of Defendants' market position, as alleged herein, Defendants were able to exact substantial and monopolistic price increases for both aluminum and the Midwest Transaction Premium.  These price increases demonstrate directly Defendants' market and monopoly power.

117.   Defendants have abused their monopoly power.  Defendants have agreed with one another to abuse their monopoly power.  They have done so in order anti-competitively and restrictively limit unreasonably the free alienability

of aluminum stored in LME-approved warehousing and, thereby, artificially inflate the price of aluminum, including the Midwest Transaction Premium, as well as the storage costs paid directly to Defendants.

118.   As a direct and foreseeable result, Plaintiff and Class members have been injured in their business or property in that they had to pay artificially high prices for aluminum.

119.   Defendants' conduct and its resulting impact on the price of aluminum, including the Midwest Transaction Premium, occurred in or affected U.S. interstate commerce.

120.   The anticompetitive effects of Defendants' conduct far outweigh any ostensible competitive benefits or justifications.

121.   Plaintiff and members of the Class have been injured in their business or property by Defendants' monopolization, attempted monopolization and/or conspiracy to monopolize.

## <u>THIRD CLAIM FOR RELIEF</u>
### (For Unjust Enrichment)
### Against All Defendants

122.   Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

123.   Defendants financially benefited from their unlawful acts.  These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and purchase aluminum at artificially inflated prices.

124.   As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner.

125.   Each Defendant should pay restitution for its own unjust enrichment to Plaintiff and members of the Class.

126.   Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A.     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative, and their counsel be appointed as Class counsel;

B.     For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

C.     For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful monopoly in violation of Section 2 of the Sherman Act;

D.     For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

E.     For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

F.     For a judgment awarding Plaintiff and the Class restitution of any and all sums received by the Defendants' unjust enrichment;

G.     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

H.     For such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR A JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury of all issues so triable.

Dated: November 20, 2013

CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP


By: /s/Patrick E. Cafferty
Patrick E. Cafferty, Esq.
101 N. Main Street, Suite 565
Ann Arbor, MI 48104
Tel.: 734-769-2144
Fax: 734-769-1207
pcafferty@caffertyclobes.com
Mich. Bar No. P35613

Gerald Lawrence, Esq.
LOWEY DANNENBERG COHEN
        & HART, P.C.
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428-2977
Tel.: 610-941-2760
Fax: 610-862-9777
glawrence@lowey.com

Vincent Briganti, Esq.
Geoffrey M. Horn, Esq.
Peter D. St. Phillip, Esq.
Raymond Girnys, Esq.
LOWEY DANNENBERG COHEN
        & HART, P.C.
One North Broadway
White Plains, New York 10601
Tel.: 914-997-0500
Fax: 914-997-0035
vbriganti@lowey.com
ghorn@lowey.com
pstphillip@lowey.com
rgirnys@lowey.com

*Counsel for Plaintiff and the
    Proposed Class*